# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

CHARLES McMANEMY,

               Plaintiff,

vs.

BRUCE TIERNEY, et al.,

               Defendants.

No. C17-3020-LTS

**MEMORANDUM OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

---

## I.  INTRODUCTION

This case is before me on a motion (Doc. No. 34) for summary judgment filed by defendants Jennifer DeGroote, Karson Roose, DeWayne Viet, Jason Johnson, Jennifer Becker and Butler County, Iowa.[1]  Plaintiff Charles McManemy has filed a resistance (Doc. No. 44) and defendants have replied (Doc. No. 53).  I find that oral argument is not necessary.  *See* N.D. Ia. L.R. 7(c).

## II.  PROCEDURAL HISTORY

McManemy commenced this action by filing a complaint (Doc. No. 2) on March 16, 2017, and defendants answered, denying liability and raising various affirmative defenses.  Doc. Nos. 14, 15, 17.  The complaint includes several constitutional claims

---

[1] Johnson was employed as the Sheriff of Butler County at the time of the events leading to the present complaint.  Doc. No. 2 at ¶ 4.  DeGroote, Roose and Viet were employed as dispatchers or jailers with the Butler County Sheriff's Office, and Becker was employed as a nurse.  *Id.* at ¶ 9-12.  Each of these defendants are sued in their individual capacities, for monetary and punitive damages.  This motion does not encompass the group of defendants employed by Grundy County, Iowa, or the claims that arose from McManemy's arrest.  This motion does encompass several "John/Jane Doe" defendants.  As discovery in this case is closed, and McManemy has not amended his complaint or identified any unknown defendants, the motion for summary judgment is granted as to the John/Jane Doe defendants.

brought under 42 U.S.C. § 1983, as well as claims brought under Iowa law against various state employees and two Iowa counties. All of the claims arise from the events that transpired during McManemy's March 18, 2015, arrest by officers from Butler and Grundy County, Iowa, and his subsequent period of incarceration in the Butler County jail from March 18, 2015, to October 7, 2015. The following claims are subject to the present motion:

> Count V: Violation of Right to Due Process (§ 1983) against Johnson, Roose, DeGroote and Viet.
>
> Count VI: Violation of Right to Bodily Integrity (§ 1983) against Johnson, Roose, DeGroote, Viet and Becker.
>
> Count VII: Negligent Hiring, Training and Supervision (Iowa law) against Johnson and Butler County.
>
> Count IX: Negligence (Iowa Law) against Johnson, Roose, DeGroote and Viet.

The defendants filed their motion on March 12, 2018. After receiving an extension of time to conclude discovery, McManemy filed his resistance on May 14, 2018.

## III.  RELEVANT FACTS

Unless otherwise noted, the parties do not dispute the following facts:

On March 18, 2015, defendant Kirk Dolleslager, a law enforcement officer with the Grundy County Sheriff's Office, attempted to initiate a traffic stop on McManemy.[2] Doc. No. 2 at ¶¶ 14, 18. McManemy did not immediately stop in response to Dolleslager's signal, and other officers became involved. Defendant Kiley Winterberg, a law enforcement officer with the Butler County Sheriff's Office, attempted to deploy a spike strip in front of McManemy's vehicle, but it went through the windshield and struck

---

[2] Because the facts surrounding the arrest do not directly affect the present motion for summary judgment, which concerns events that occurred while McManemy was incarcerated following the arrest, I will provide only a brief overview of the arrest here for context only. McManemy contends that the defendants did not properly treat the injuries he sustained during the arrest.

or grazed McManemy's shoulder. *Id.* at ¶¶ 6, 20. McManemy continued driving for several miles, with multiple deputies from Grundy and Butler Counties in pursuit. *Id.* at ¶ 21. McManemy brought his vehicle to a stop in the middle of the road on 320th St., west of Austinville, Iowa. *Id.* McManemy laid down in the middle of the road with his arms extended, presumably awaiting arrest. *Id.* at ¶ 22. According to the complaint, at that point defendants Dolleslager and Curt Lubben (another Butler County Sheriff's deputy) then tased McManemy five times. *Id.* at ¶¶ 24-28. Defendant Bruce Tierney (another Butler County Sheriff's deputy) allegedly arrived on the scene and kicked and kneed McManemy in the face. *Id.* at ¶ 31. As a result of these alleged acts, McManemy alleges he suffered injuries to his body as a whole, including injuries to his face, right eye,[3] shoulder, legs and back. *Id.* at ¶ 34.

McManemy was booked into the Butler County Jail following his arrest. Doc. No. 35-2 at 59-60. His weight was reported at 230 pounds. *Id.* at 59. He was medically screened by staff upon booking, who noted nothing that suggested a need for immediate medical attention. *Id.* at 57-58. The screening form suggests that he was "roughed up" and that he had a history of heart trouble. However, he denied bleeding, pain and the need for emergency care. *Id.* McManemy stated that he was uninjured. Doc. No. 51 at 9. The jailers took photographs of his injuries during the booking process. Doc. No. 35-2 at 41 (discussing the photographs of various injured body parts). Only photographs of McManemy's face were submitted with the present motion. While there may be slight swelling around his left eye and eyebrow in the photo, it is difficult to see whether there are any contusions, scrapes or bruises elsewhere on his face. *Id.* at 52-55.

---

[3] The complaint indicates McManemy's right eye was injured. Doc. No. 2 at ¶ 34. During his deposition, McManemy referred to being kneed repeatedly in the left eye, so that it was "deeply bruised all the way to the back," and so that it "swelled up until it closed." Doc. No. 32-5 at 35-36, 38. Later, McManemy agreed that his eye was not swollen shut in his booking photo (*See id.* at 40-41, 52-55) and corrected his statement to say that he could not see out of his eye, and that it became swollen later as the bruise developed. *Id.* at 40.

McManemy alleges that he was unconstitutionally denied or delayed medical treatment for a variety of injuries and ailments, resulting in long-term harm. He was incarcerated at Butler County Jail for just under seven months. During that time, he was seen by the jail nurse, defendant Becker, at least five times (*Id.* at 89-90, 96, 98-99), and by external physicians eight times. *Id.* at 61-65, 67-68, 71-88. McManemy testified that he was always provided his prescribed medications and that he received over-the-counter medications when he asked for them. *Id.* at 42, 50. He testified that every time he wished to see a health-care provider, he was given the appropriate medical request form to fill out. *Id.* at 43. There are no request forms in the record that do not correspond to a visit by the Butler County nurse, an external practitioner or—in one case—a subsequent communication (as requested in the form) between Becker and McManemy's psychiatrist regarding his medications.

## A. Eye Care

McManemy alleges his left eye was seriously injured during the arrest and there is little dispute he developed a mild black eye shortly following admission to the jail. On March 24, 2015, McManemy was seen by Becker for blurred vision in his left eye. *Id.* at 89. Becker described a healing black eye: "upper eye lid [was] ecchymotic with fading purple/green coloration. Upper lid is slightly edematous and left eyebrow is slightly edematous." *Id.*, *see also* Doc. No. 44-2 at 107 (Becker's testimony that "he had some fading bruises, which is what ecchymosis is, of the upper eyelid—on the left, that would be—and slight swelling of his eyelid and his eyebrow"). Becker recommended that McManemy take ibuprofen to help with the pain. Doc. No. 35-2 at 89. She stated that "nothing in [her] experience and [her] education . . . would have made me believe he needed to be checked again. He had a slightly swollen eye and a slightly swollen eyebrow and some bruising." Doc. No. 44-2 at 110.

On May 11, 2015, McManemy requested medical attention, circling the "emergency" option on the jail's standard form. *Id.* at 67. He described his symptoms

as severe head pain radiating from his left eye all throughout his head, sensitivity to light, and eye twitching. *Id.* Becker responded to the request for treatment the next day. Doc. No. 35-2 at 90. Becker noted that McManemy's left pupil was "round, equal and reactive to light," and that there was no "redness of sclera or conjunctiva." *Id.* She recommended that he be seen by an ophthalmologist, and an appointment was made for two days later with Dr. Mauer. *Id.* Dr. Mauer concluded that McManemy was suffering from a contusion (bruise) and nodular episcleritis (inflammation) in his left eye and prescribed Pred Forte drops. *Id.* at 74-75. McManemy was directed to come back for a follow-up in one month. *Id.* On June 7, 2015, McManemy filled out a medical request form asking to return to Dr. Mauer.

McManemy returned to the ophthalmologist on July 7, 2015, where both the contusion and the episcleritis were described as improved. *Id.* at 78-79. McManemy was seen by the ophthalmologist a final time on September 10, 2015, describing symptoms of "floaters" in his left eye (ongoing for two months), headache, and left eye pain. *Id.* at 80. The ophthalmologist assessed "vitreous opacities" in the left eye, which he described as a new onset symptom. *Id.* Although the ophthalmologist discussed the signs and symptoms of retinal detachment with McManemy, he did not diagnose retinal detachment during this examination.[4] *Id.* at 81. No course of treatment was prescribed or recommended, but McManemy was instructed to return in six months for a retina check. *Id.* No further records were provided related to McManemy's left eye, and it is unclear whether he has sought further treatment for this condition. During his January 4, 2018, deposition, McManemy testified that he still has eye pain, vision loss, headaches and floaters. *Id.* at 36. There is no medical documentation of vision loss.

---

[4] Retinal detachment and vitreous opacities are related. *See* Am. Soc. of Retina Specialists, Vitrectomy for Floaters, https://www.asrs.org/patients/retinal-diseases/28/vitrectomy-for-floaters (last accessed May 17, 2018). Vitreous opacities can occur naturally with aging, or subsequent to trauma. *Id.* However, the treatment notes did not indicate that the ophthalmologist had an opinion as to what caused McManemy's symptoms, or how severe the symptoms were.

## B.    *Mental Health*

McManemy applied for mental health services through the jail on April 28, 2015. *Id.* at 47.  He was first seen by a psychiatrist, Dr. Antony, on May 13, 2015.  *Id.* at 61-65.  McManemy reported that his "anxiety is real high . . . I have mood swings.  In the morning I feel like punching everyone [in the] face.  I have racing thoughts."  *Id.* at 64. Although McManemy testified that he had never had mental health problems prior to his incarceration in Butler County (Doc. No. 44-2 at 38), the medical records indicate a history of such problems, including depression, mood swings, impulse control issues, anxiety and insomnia.  Doc. No. 35-2 at 64.  He had previously been on medication for these issues while he was incarcerated, but it is unclear whether he ever received treatment outside of jail.  *Id.*  Dr. Antony diagnosed McManemy with bipolar and anxiety disorder, and prescribed Depakote, Mirtazapine and Remeron.  *Id.* at 61-63, 65.

On June 1, 2015, McManemy was seen by another psychiatrist, Dr. Jack, who increased McManemy's Depakote dosage and added Trazadone.  *Id.* at 71-73.  Dr. Antony saw McManemy again on June 27, 2015, after he complained that his current medications were not helping and that he was having racing thoughts.  *Id.* at 67-68.  Dr. Antony added a prescription for Seroquel to help with sleep disturbances.  *Id.*  On July 3, 2015, McManemy filled out a medical request form asking Becker to email his psychiatrist (Dr. Antony) to adjust his medications.  Doc. No. 44-2 at 49.  Dr. Antony did so via email on July 7, 2015, without an in-person visit.  Doc. No. 35-2 at 70.  No medical records have been provided related to McManemy's mental health after that July 7 interaction.  However, McManemy contends that he still experiences symptoms that he attributes to his time in the Butler County jail.

## C.    *Hypertension and Diabetes[5]*

On May 27, 2015, McManemy reported that he thought his blood pressure was high.  His blood pressure was measured at 140/72 and it appears no further action was taken at that time.  *Id.* at 94.  On June 18, 2015, McManemy requested medical attention because his legs and feet were swollen.  Doc. No. 44-2 at 57.  Becker saw McManemy the same day and recommended that he be seen by a doctor.  *Id.* McManemy's blood pressure was recorded between 160/102 and 148/96.  *Id.* An appointment was scheduled at Peoples Community Health Clinic in Clarkesville, Iowa (Peoples Clinic), for the following day.  McManemy was diagnosed with hypertension and instructed to reduce his sodium intake and take in extra water during the day.  Doc. No. 35-2 at 82.  His blood pressure was recorded at 140/82 and he weighed 291.80 pounds.  *Id.* McManemy was instructed to return for a follow-up appointment in six months and the ARNP suggested compression stockings to help with the swelling in his legs.  *Id.*

On September 9, 2015, McManemy was seen again at Peoples Clinic one day after requesting medical attention for his swollen legs.  *Id.* at 84-85, 98.  The ARNP switched McManemy's prescription to a different water pill to address the swelling in his legs, and prescribed compression stockings.  *Id.* at 84.  McManemy's blood pressure had improved to 118/80, although he had continued to gain weight.  *Id.* He was advised that he needed

---

[5] McManemy was diagnosed with hypertension while at the Butler County Jail, and diabetes when he was transferred to Oakdale prison.  When discussing the symptoms of either, McManemy does not usually differentiate which ailment he is talking about.  For example, he repeatedly claims at times that he should have received a special diet and that the jail's standard diet caused his diabetes (Doc. No. 35-2 at 44 ("I'm claiming that I got diabetes while I was in the Butler County Jail on that diet"); Doc. No. 44-2 at 36 ("[A]fter I seen my doctor, they said it was because of all the sodium intake . . . I got diabetes over it)), but it is undisputed that the only discussion of a special diet by his treating physician prior to his transfer to Oakdale was a low-sodium diet in response to his high blood pressure.  Doc. No. 35-2 at 82 (McManemy instructed to "try to keep his sodium intake down.").  Since no medical records were submitted regarding his diabetes diagnosis, it is difficult to know which symptoms can properly be attributed to diabetes rather than hypertension.  Therefore, I will consider the conditions together for purposes of this motion for summary judgment.

to try to keep his sodium intake down and drink plenty of water.[6]  *Id.*  McManemy testified that he was prescribed a low sodium diet (Doc. No. 44-2 at 37) but the two records from Peoples Clinic are the only documentation of any dietary restrictions and they are not prescriptions.  The Butler County Jail's policy requires a prescription for medical dietary modifications.  Doc. No. 35-2 at 41.  Johnson testified that the menu at the Butler County Jail was regularly approved by a dietician and the menu was re-certified in June 2015.  Doc. No. 51 at 32-33, 35.

A lab report dated September 8, 2015, indicates that McManemy's blood sugar was flagged as high at that time.  However, the report does not include any analysis of the data and the medical records from Peoples Clinic do not discuss the possibility of a diabetes diagnosis.  Doc. No. 35-2 at 87.  McManemy has provided no expert testimony to suggest that either the jailers or the doctors should have recognized this sole symptom as indicative of problems beyond hypertension.

Upon admission to Oakdale in October 2015, McManemy was diagnosed for the first time with Type 2 diabetes.[7]  At this point, he weighed 309 pounds.  *Id.* at 47.  McManemy states he was placed on a special diet when he was transferred to Oakdale but at the time he was deposed in this case he had been released and re-incarcerated at a jail in Bremer County, and again at Oakdale, without receiving a special diet.[8]  *Id.* at 49.  The defendants allege that McManemy caused or worsened his health problems by voluntarily eating junk food, candy and soda from the commissary, and by refusing opportunities to exercise.  Doc. Nos. 35-2 at 44; 51 at 38-39.

---

[6] McManemy was also diagnosed with GERD, for which he was prescribed omeprazole.  *Id.* at 84.  He does not appear to make any claims related to this diagnosis.

[7] No medical records were submitted to the court from McManemy's time at Oakdale.

[8] No evidence has been provided as to which of McManemy's conditions the diet at Oakdale was meant to address (diabetes or hypertension), nor has any evidence been provided as to why McManemy is no longer on a special diet.

## IV. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine. Put another way, "'[e]vidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The parties "may not merely point to unsupported self-serving allegations." *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008).

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of

informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. *Id.* If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

To determine whether a genuine issue of material fact exists, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citing *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996)). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick*, 90 F.3d at 1377.

## V. DISCUSSION

Defendants argue they are entitled to summary judgment on Counts V and VI because the undisputed facts demonstrate that McManemy's constitutional rights were not violated. With regard to Count V, the defendants contend McManemy was provided appropriate medical care. As for Count VI, the defendants contend that McManemy has not stated a claim or provided evidence for a violation of his right to bodily autonomy. In the alternative, the defendants argue that they are entitled to qualified immunity on the constitutional claims.

Regarding Counts VII and IX,[9] the defendants argue that they are immune under Iowa law and that no reasonable jury could find the defendants were negligent (either directly on Count IX, or through negligent hiring, training or supervision on Count VII). McManemy generally resists.

## A.   *Count V (Due Process)*

McManemy alleges that defendants Johnson, Roose, DeGroote and Viet (but not Becker) violated his constitutional rights by failing to provide adequate medical treatment for his serious medical needs. Doc. No. 2 at ¶ 90. The complaint did not specify which specific "serious medical needs" were inadequately treated, or which steps the defendants took that were inadequate (or how they were inadequate).[10] During his deposition, McManemy did not identify any specific acts by the individual defendants that constituted a violation of his due process rights, with the exception of Johnson, who allegedly refused to change his diet. McManemy's resistance to the motion for summary judgment appears to argue that the delay or denial of care for his eye caused the (alleged) retinal detachment, that the delay or denial of psychiatric treatment worsened his mental health to the point of injury, and that the delay or denial of a proper diet and other treatment caused his diabetes. Defendants contend they are entitled to judgment as a matter of law because McManemy has not established a violation of his due process rights. Specifically, they contend that McManemy's medical needs, serious or otherwise, were promptly and appropriately treated. Defendants additionally argue that McManemy's claim fails for a lack of expert testimony.

Pretrial detainees have a constitutional right to adequate medical care. *See West v. Atkins*, 487 U.S. 42, 55 (1988). As a pretrial detainee, McManemy's right to medical

---

[9] Because the substantive law on Count VII depends in part on my findings on Count IX, I will address them in reverse order.

[10] Indeed, the complaint so inadequately lays out the basis for the claim that a 12(b)(6) motion would have been appropriate.

care arises under the Due Process Clause of the Fourteenth Amendment. *Jackson v. Buckman*, 756 F.3d 1060 (8th Cir. 2014). The Eighth Circuit has held that the "deliberate indifference" standard that governs claims brought by convicted inmates under the Eighth Amendment applies in pretrial detainee cases. *Id.*

> Whether an official was deliberately indifferent requires both an objective and a subjective analysis. Under the objective prong, a plaintiff must establish that he suffered from an objectively serious medical need. To be objectively serious, a medical need must have been diagnosed by a physician as requiring treatment or must be so obvious that even a layperson would easily recognize the necessity for a doctor's attention. Under the subjective prong, a plaintiff must show that an official actually knew of but deliberately disregarded his serious medical need. This showing requires a mental state akin to criminal recklessness. Consequently, a plaintiff must show more than negligence, more even than gross negligence to evince deliberate indifference. Merely demonstrating that a prison doctor committed medical malpractice is insufficient to establish deliberate indifference. An inmate must demonstrate that a prison doctor's actions were so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.

*Jackson*, 756 F.3d at 1065-66 (cleaned up).[11] When a plaintiff claims that his or her constitutional rights were violated by a delay in medical treatment, "the objective seriousness of the deprivation [is measured] by reference to the *effect* of the delay in treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (citations omitted). To establish the effect of delayed treatment, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Id.* Expert testimony may be required to overcome a motion for summary judgment. *Jackson v. Riebold*, 815 F.3d 114, 1120 (8th Cir. 2016). Failure to submit evidence establishing the effects of delay is fatal to resisting a summary judgment motion.

---

[11] The parenthetical "(cleaned up)" may be used "when extraneous, residual, non-substantive information has been removed" from a citation, in this case, bracketed modifications, internal quotation marks and internal citations. *See, e.g., United States v. Steward*, 880 F.3d 983, 986 & n.2 (8th Cir. 2018).

### 1.	Eye Problems

Regarding his eye problems, McManemy argues that the contusion, nodular episcleritis and vitreous opacities with possible retinal detachment were a "serious medical need" which his jailers "deliberately ignored." Regarding the objective element, I am unable to find (and McManemy has not provided any evidence) that the black eye initially presented to his jailers constituted an "objectively serious medical need" when he first sought medical attention on May 24, 2015. To constitute a serious medical need, the condition must be "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman*, 114 F.3d at 784. As Becker testified, there was no reason at that time to believe that McManemy was suffering from anything more than a black eye which appeared to be healing. Later, when an ophthalmologist noted a contusion and nodular episcleritis, the defendants complied with the doctor's orders and provided eye drops as needed. *See Scott*, 742 F.3d at 340 ("[t]o be objectively serious, a medical need must have been diagnosed by a physician as requiring treatment").

Assuming that McManemy's eye condition became an objectively serious medical need at some point,[12] there is no evidence whatsoever that the defendants treated it with deliberate indifference. McManemy requested medical attention for his eye three times. The first time he was seen by a nurse and an ophthalmologist and the next two times he was seen by an ophthalmologist shortly after making his request. Although there was a short delay between requesting to be seen and actually being seen, McManemy has produced no evidence—expert or otherwise—to suggest that this delay was unreasonable, that it worsened his condition or that an earlier appointment would have changed his

---

[12] I do not find that the vitreous opacities, with or without a detached retina, were in fact an objectively serious medical need. As discussed above, there is scant evidence as to the extent of McManemy's eye injury. There are no current records as to the state of his eye, other than his self-serving statements during his deposition that he still experiences "floaters" and pain. Verified medical evidence is necessary for a deliberate indifference claim.

condition. McManemy has produced no evidence to suggest that the delay was deliberate.[13] Simply put, the timely provision of adequate treatment cannot be considered deliberate indifference. The defendants are entitled to summary judgment on this claim.

### 2. *Mental Health*

McManemy also (briefly) argues that his mental health was inadequately treated by the defendants. He states that he had never been diagnosed with bipolar disorder before his incarceration at the Butler County jail, and that his requests for mediation went unanswered. McManemy does not attempt to argue that his psychiatric symptoms were an objectively serious medical need or that the alleged lack of treatment was the result of deliberate indifference. Regardless, the undisputed record does not support a finding for McManemy on either issue. The undisputed record shows that McManemy was screened by a psychiatrist upon request on May 13, 2015. He was seen two more times after that, after which his medications were adjusted pursuant to his complaints. On one occasion, his medication was adjusted with no visit, in accordance with his request. McManemy agrees that his medication was dispensed in the manner required by his prescriptions. Again, timely and adequate attention to medical needs cannot be considered deliberate indifference. As with the claims related to McManemy's left eye, the defendants are entitled to summary judgment on this claim.

### 3. *Hypertension and Diabetes*

Regarding hypertension and diabetes, McManemy argues that his symptoms (weight gain and swelling in the ankles and feet) were so readily apparent that the defendants should have recognized his need for treatment. McManemy also informed

---

[13] The reason for delay is not in evidence. However, I note that an innocent delay caused by the unavailability of an appointment does not constitute "deliberate indifference." *Cullor v. Baldwin*, 830 F.3d 830, 839 (8th Cir. 2016).

the nurse on one occasion that he felt that his blood pressure was high.[14]  It is difficult to determine if these symptoms were so severe that a reasonable observer would have recognized the need for medical treatment.  McManemy argues that his ailments satisfy the "obvious to a layperson" test by reference to the Eighth Circuit's decision in *Roberson v. Bradshaw*, 198 F.3d 645 (8th Cir. 1999).  In *Roberson*, the plaintiff was known to have diabetes during the period of time that he alleged treatment was improperly delayed or withheld.  *Id.* at 646.  The plaintiff alleged that he had "suffer[ed] weeks of excessive urination, excessive thirst, migraine-like headaches, diarrhea, dehydration, sweating and weight loss, as well as excessive hunger, dizziness, diminished vision, loss of sleep . . . nausea and fits of raving and delirium," as a bad reaction to diabetes medication provided by the jail.  *Id.* (internal quotation marks omitted).  The Eighth Circuit held that *if* the plaintiff experienced those symptoms, a reasonable layperson would likely recognize the need for medical treatment, allowing the court to address whether a subsequent delay in treatment constituted deliberate indifference.

The record before me does not establish that McManemy's symptoms were as severe as the symptoms in *Roberson*, or that they were so obvious that a layperson would recognize the need for medical treatment.  McManemy had not yet been diagnosed with diabetes at the time of his incarceration in Butler County Jail.  Indeed, his treating physician did not appear to have enough information to diagnose him with diabetes prior to his transfer to Oakdale.  These facts make his case distinguishable from *Roberson*. McManemy has not produced any evidence that his diabetes was obvious prior to its diagnosis.  However, *regardless* of whether his condition was objectively serious, the undisputed facts establish that McManemy was given treatment for all of his complained-

---

[14] In an interrogatory answer submitted to the court, McManemy states that he reported stomach pains, blurred vision, constant state of unrest, excessive weight gain, high blood pressure, low blood sugar and high sodium levels to his jailers.  The medical attention request forms do not correspond to each of these symptoms, but my determination on the subjective prong negates the need to conclusively determine whether his physical condition constituted an objectively serious medical need.

of ailments. Thus, McManemy cannot establish the deliberate indifference prong. Although he argues that "[t]he only thing the Jail Defendants did to try and cure [his] issues were to provide him medication in vast quantities" (Doc. No. 44 at 12), the record establishes that he was taken to Peoples Clinic to address his symptoms and that his treating physician prescribed medication to treat his condition.[15] McManemy does not argue that his treating physicians were prevented from prescribing a different treatment, rather he appears to fault the jail for following his treating physician's recommendations.

McManemy argues that the defendants could have done more by providing him a proper diet and ensuring that he had opportunity to exercise. As discussed above, there is no evidence that his physician provided him with a prescription for a particular diet. To the extent the physician recommended a particular diet, it was a low-sodium diet to address hypertension, not a diabetes diet addressing sugar intake. I cannot conclude that the defendants should have realized McManemy needed a low-sugar diet if his doctor did not prescribe one. McManemy was given the opportunity to reduce his salt intake when he was provided with information on the nutritional values of the food served. Further, he could have changed his canteen purchasing habits and taken advantage of the opportunity to exercise when offered.

Finally, McManemy has presented no evidence—expert or otherwise—that the failure to change the menu in the absence of a prescription (or an otherwise-clear need) aggravated his hypertension or caused his diabetes. Indeed, there are no medical records before me after the time McManemy was removed from Butler County Jail. It is impossible to say whether his condition is worse or better now than it was when he was at the Butler County Jail, or to discern which factors made that difference. The Eighth Circuit has previously held that when a plaintiff submits evidence documenting his

---

[15] There was also a prescription for compression tights to address the swelling in McManemy's legs. It is unclear if that prescription was ever filled; however, McManemy does not raise the presence or absence of compression tights as an issue anywhere in his brief.

diagnosis and treatment, but offers no evidence establishing that any delay in treatment had a detrimental effect, the plaintiff fails to raise a genuine issue of fact on an essential element of the claim. *Jackson*, 815 F.3d at 119-20. This is such a case, and the defendants are entitled to summary judgment on this claim.

## B.    Count VI (Bodily Integrity)

For Count VI, McManemy alleges that his Fourteenth Amendment right to bodily integrity was violated by defendants Johnson, Roose, DeGroote and Becker when they failed, through either actions or omissions, to ensure his bodily integrity and physical well-being. Doc. No. 2 at ¶¶ 97-107. McManemy's complaint does not describe *how* his right to bodily integrity was violated, or which acts or omissions caused such a violation. At ¶ 107, McManemy refers back to the denial of adequate medical care as a basis for the violation of the right to bodily integrity.

Defendants argue that McManemy has failed as a matter of law to state a violation of the right to bodily integrity and that, in the alternative, they are entitled to qualified immunity. "The Supreme Court has recognized a substantive due process right to bodily integrity . . . ." *Rogers v. City of Little Rock*, 152 F.3d 790, 795 (8th Cir. 1998) (citing *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997); *see also Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 287-88 (1990) (O'Connor, J., concurring)). For governmental interference to violate a person's protected liberty interest in bodily integrity under the Fourteenth Amendment, the interference must be so severe that it shocks the conscience. *Id.* at 797, *see also Rochin v. California*, 342 U.S. 165, 172 (1952). "[W]hether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Cruzan*, 497 U.S. at 279 (citing *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)).

In *Rochin*, the Supreme Court considered whether a deputy sheriff's actions in forcing an emetic solution through a tube into an accused's stomach to produce vomiting, for the purpose of searching for evidence of drug smuggling, violated that inmate's right

to bodily autonomy. 342 U.S. at 166-68. The Court concluded that the need to find evidence of a crime did not outweigh the suspect's right to bodily autonomy and held that law enforcement must observe some sort of judicial process before invading an inmate's person. *Id.*, *see also Cruzan*, 497 U.S. at 269-79 (right to bodily autonomy includes right to refuse lifesaving medical treatment); *Washington v. Harper*, 494 U.S. 210, 221-22, 229 (1990) (mentally ill prisoner possessed significant liberty interest in avoiding unwanted administration of antipsychotic drugs, subject to due process protections). Courts interpreting an inmate's or arrestee's right to bodily autonomy since *Rochin* have looked for similar invasions upon the person, and whether those invasions were justifiable. For example, in *Rogers* an on-duty police officer sexually assaulted a woman he had stopped for a traffic violation. 152 F.3d at 796. The Eighth Circuit found that the officer violated the plaintiff's due process right to bodily integrity, holding that his conduct was easily classified as brutal, wantonly cruel or coercive so as to shock the court's conscience, while serving no legitimate policing purpose. *Id.*

McManemy's argument about the right to bodily autonomy and the right to choose his medical treatment notwithstanding, he has not plead or produced evidence of a violation of his due process rights. His argument that defendants violated this right is based on the denial of healthcare. McManemy has not cited any cases supporting the proposition that the mere denial of basic care is a violation of bodily integrity. Even if the denial of care could establish such a violation, I have already concluded that the defendants did not deliberately deny McManemy any kind of medical treatment. Simply put, defendants' actions or inactions in this case did not impede upon McManemy's body or his right to consent in any way that "shocks the conscience." Defendants are entitled to judgment on this claim.[16]

---

[16] Because Counts V and VI fail as a matter of law, I will not address defendants' arguments that they are entitled to qualified immunity.

## C.    Count IX (Negligence)

McManemy alleges that defendants Johnson, Roose, DeGroote and Viet breached a duty of care to provide for McManemy's safety, security, custody, control and well-being by failing to provide adequate medical treatment.  *Id.* at ¶¶ 123 and 125.  As with the constitutional claims, McManemy's complaint does not specify which acts or omissions were negligent.[17]  According to McManemy's brief, the defendants committed negligence when "McManemy made multiple requests for medical attention that were either treated by a nurse without requisite training or went untreated.  The Jail Defendants knew about McManemy's health issues but did nothing to try and cure them and labeled him as a habitual complainer."  Doc. No. 44 at 24-25 (citations to the record omitted).  Defendants respond that they are immune from such a claim under state law[18] and, in any event, that the negligence claim fails in the absence of expert testimony as to the appropriate standard of care and causation.

Under Iowa law, the elements of a medical negligence action are "(1) an applicable standard of care, (2) a violation of this standard, and (3) a causal relationship between the violation and injury sustained."  *Plowman v. Fort Madison Cmty. Hosp.*, 896 N.W.2d 393, 402 (Iowa 2017).  Jailers in Iowa have an obligation to furnish each inmate with appropriate medical care.  Iowa Code § 356.5(2).  In addition, a jailer has a common law

---

[17] This fact alone could be fatal to his claim under Iowa law.  *See Welte v. Bello*, 482 N.W.2d 437, 439 (Iowa 1992) ("As a general rule, a party claiming negligence must identify specifically the acts or omissions constituting negligence.").  However, because McManemy attempted to describe the alleged breach in his brief, I will proceed as if the claim was properly pleaded.

[18] Defendants immunity argument posits that the provision of medical care, inadequate or otherwise, is a matter of discretion for jailers and thus subject to Iowa's municipality discretionary-function immunity under Iowa Code § 670.4(c).  Defendants cite to no Iowa case which has held that the provision of medical care fits within this exception to Iowa's general rule of liability.  The Northern District of Iowa has previously declined to extend immunity under Iowa law to jailers whose allegedly negligent provision of medical care resulted in a wrongful death claim, and I find that the same logic applies here.  *Arms-Adair v. Black Hawk Cnty.*, No. C13-2008, 2013 WL 2149614 (N.D. Iowa May 16, 2013).  However, the matter of immunity is irrelevant in this case given my resolution of the underlying tort claims.

duty "to exercise reasonable diligence with reference to the care of injured, ill, or diseased inmates." *Heumphreus v. State*, 334 N.W.2d 757, 759 (Iowa 1983); *see also Lang v. City of Des Moines*, 294 N.W.2d 557, 560 (Iowa 1980) (describing the city's duty of care as a duty "to use ordinary and reasonable care in providing medical and physical services for injured or ill prisoners."); *Smith v. Miller*, 40 N.W.2d 597, 598 (Iowa 1950) ("Aside from statutory requirements a sheriff owes a general duty to a prisoner to save him from harm and he is personally liable for negligence or wrongful acts causing the prisoner's injury or death."). Further, Iowa has adopted § 314A(4) of the Restatement (Second) of Torts, which imposes a duty of care on one who takes custody of another. *Deppe v. Poweshiek Cnty.*, 542 N.W.2d 6, 8 (Iowa 1995) (Iowa law requires that "persons who take others into their custody owe a special duty to aid and protect them."). Section 314A(4) comment e describes the duty as limited:

> The duty in each case is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury . . . . He is not required to take any action where the risk does not appear to be an unreasonable one, as where a [plaintiff] appears . . . likely to recover shortly without aid.

Restatement (Second) of Torts § 314A(4) cmt. *e*.

Whether a jailer is in breach of the duty of care will depend on whether the provision of medical care was adequate under the circumstances. Of course, this reasonableness standard is a lesser burden than the deliberate indifference standard that applies to McManemy's constitutional claims. However, the fact that McManemy carries a lesser burden on this count does not negate the need for expert testimony in a medical negligence case. "The longstanding Iowa rule is that in a tort action the necessity of expert testimony or the quality of necessary expert testimony determines whether substantial evidence supports the submission of the causal relationship between the act of the wrongdoer and the injury." *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 792 (Iowa 2009). "When the causal connection between the tortfeasor's actions and the

plaintiff's injury is not within the knowledge and experience of an ordinary layperson, the plaintiff needs expert testimony to create a jury question on causation." *Id.* at 793. Further, in a medical negligence case, "proximate cause . . . cannot be based upon mere speculation." *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 718 (Iowa 2001).

McManemy's claim requires expert testimony. The development, diagnosis and treatment of any of McManemy's conditions is not within the knowledge and experience of the ordinary person, nor is the effect of delayed treatment. However, even assuming that an ordinary person could discern whether McManemy's diagnosis and treatment were delayed to harmful effect without the assistance of expert testimony, McManemy has not generated an issue of fact on breach or causation. The undisputed facts indicate that the defendants followed McManemy's treating physician's orders in all respects. It cannot be negligence to treat a pre-trial detainee in accordance with his physician's recommendations. The *only* possible omission in McManemy's treatment was that he was not provided a low-sodium diet, but such a diet was not prescribed by a physician. McManemy has put forth no evidence that this omission caused meaningful harm. Further, McManemy has not put his current medical records into evidence and has not established that he is presently injured due to any act or omission that allegedly took place during his incarceration. In the absence of any evidence of causation, no reasonable jury could find that the defendants were negligent in treating McManemy. The defendants are entitled to summary judgment on this claim.

### D. Count VII (Negligent Hiring and Supervision)

McManemy's complaint alleges that Johnson and Butler County are liable for negligent hiring, training and supervision. Doc. No. 2 at ¶ 110. The complaint does not specify which aspects of the hiring, training or supervision process at Butler County were deficient. *Id.* at ¶¶ 108-13. Defendants argue that they are entitled to state law

discretionary-function immunity on the negligent hiring, training and supervision claim,[19] and by arguing that the claim fails in the absence of an underlying tort. In any event, no evidence has been submitted to the court regarding the hiring, training or supervision of the Butler County Jail employees, beyond a reference in three of the employees' depositions to attending the state's "jail school." Doc. No. 45-2 at 114-19.

Under Iowa law, to establish negligent supervision a plaintiff must show:

(1)     the employer knew, or in the exercise of ordinary care should have known, of its employee's unfitness at the time the employee engaged in wrongful or tortious conduct;

(2)     through the negligent . . . supervision of the employee, the employee's incompetence, unfitness, or dangerous characteristics proximately caused injuries to the plaintiff, and

(3)     there is some employment or agency relationship between the employee and the defendant employer.

*Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 680 (Iowa 2004). More fundamentally, a claim for negligent supervision fails in the absence of an underlying tort or wrongful act committed by the employee. *Kiseau v. Bantz*, 686 N.W.2d 164, 172 (Iowa 2004). I have already found that there is no underlying tort. In addition, there is no evidence of negligent training, hiring or supervision in the summary judgment record. As such, this claim fails as a matter of law.

---

[19] Defendants are not entitled to immunity on this claim. *See Doe v. Cedar Rapids Cmty. Sch. Dist.*, 652 N.W.2d 439, 445 (Iowa 2002) ("Although a [municipality] may very well make policy decisions concerning [employees] and their conduct, a decision concerning an individual [employee] with these policies as a backdrop does not catapult those decisions into the zone of immunity of the discretionary function. Decisions about individual [employees] that may have policy implications do not elevate such decisions to the level of economic, political, or social policy-making."). Nevertheless, the claim fails for the reasons discussed above.

## VI.     CONCLUSION

For the foregoing reasons, the motion (Doc. No. 34) for summary judgment filed by defendants Jennifer DeGroote, Karson Roose, DeWayne Viet, Jason Johnson, Jennifer Becker and Butler County, Iowa, is **granted** in its entirety.  As a result:

1. Counts V and VI are **dismissed** in their entirety.

2. Count VII is dismissed as against defendants Johnson and Butler County.

3. Count IX is **dismissed** as against defendants Viet, Roose, DeGroote, Becker and Johnson.

4. Because no claims remain against defendants Viet, Roose, DeGroote, Becker, Johnson or Butler County, those defendants are **dismissed** from this case.

**IT IS SO ORDERED.**

**DATED** this 5th day of June, 2018.

_____
Leonard T. Strand, Chief Judge