# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| CHARLES McMANEMY,<br><br>   Plaintiff,<br><br>vs.<br><br>BRUCE TIERNEY, et al.,<br><br>   Defendants. | No. C17-3020-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

This case is before me on two motions: (1) a motion (Doc. No. 57) for summary judgment filed by defendants Bruce Tierney, Kiley Winterberg, Curt Lubben, Jason Johnson and Butler County, Iowa,[1] and (2) a motion (Doc. No. 74) for summary judgment filed by defendants Kirk Dolleslager, Rick Penning, and Grundy County, Iowa.[2] Plaintiff Charles McManemy has resisted both motions (Doc. No. 67, 79) and both sets of defendants have replied (Doc. No. 71, 87). I find that oral argument is not necessary on either motion. *See* N.D. Ia. L.R. 7(c).

---

[1] Johnson was the Butler County Sheriff at the time of McManemy's arrest. Doc. No. 2 at ¶ 4. Tierney, Winterberg and Lubben were law enforcement officers with the Butler County Sherriff's Office. *Id.* at ¶ 6-8. I previously granted summary judgment against McManemy as to defendants Jennifer DeGroote, Karson Roose, Dewayne Viet and Jennifer Becker, as well as the unnamed "John/Jane Doe" defendants. *See* Doc. No. 54. The claims against Johnson and Butler County arising from the treatment McManemy received for his various ailments while incarcerated were also dismissed by my order at Doc. No. 54, although negligent hiring, training and supervision claims arising from the arrest remain against these defendants under Count VII.

[2] Penning was the Grundy County Sheriff at the time of McManemy's arrest and Dolleslager was a law enforcement officer with the Grundy County Sheriff's Office. Doc. No. 2 at ¶¶ 5, 14.

## II. PROCEDURAL HISTORY

McManemy filed a complaint (Doc. No. 2) on March 16, 2017, and defendants answered, denying liability and raising various affirmative defenses. Doc. Nos. 14, 15, 17. The complaint asserts several constitutional claims brought under 42 U.S.C. § 1983, as well as claims brought under Iowa law against various state employees and two Iowa counties. All of the claims arise from the events that transpired during McManemy's March 18, 2015, arrest by officers from Butler and Grundy County, Iowa, and during his subsequent period of incarceration in the Butler County jail from March 18, 2015, to October 7, 2015. On June 5, 2018, I granted defendants' motion for summary judgment as to Counts V, VI, parts of Count VII, and Count IX. Doc. No. 54. The following claims are subject to the present motion:

> Count I: Violation of Right to be Free from Excessive Force and Unreasonable Seizures (§ 1983) against Dolleslager – Taser Bursts.
>
> Count II: Violation of Right to be Free from Excessive Force and Unreasonable Seizures (§ 1983) against Lubben – Bystander Liability for Count I.
>
> Count III: Violation of Right to be Free from Excessive Force and Unreasonable Seizures (§ 1983) against Tierney – Assault.
>
> Count IV: Violation of Right to be Free from Excessive Force and Unreasonable Seizures (§ 1983) against Lubben and Dolleslager – Bystander Liability for Count III.
>
> Count VII: Negligent Hiring, Training and Supervision (Iowa law) against Johnson, Penning, Butler County and Grundy County.
>
> Count VIII: Assault and Battery (Iowa law) against Dolleslager, Lubben, Tierney and Winterberg.
>
> Count IX: Negligence (Iowa law) against Dolleslager, Lubben, Tierney, Winterberg and Johnson.

## III. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id*. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*. "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine. Put another way, "[e]vidence, not contentions, avoids summary judgment." *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 578 (8th Cir. 2006) (citation omitted). The parties "may not merely point to unsupported self-serving allegations." *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008).

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of

informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. *Id.* If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

To determine whether a genuine issue of material fact exists, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citing *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996)). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick*, 90 F.3d at 1377.

## IV. RELEVANT FACTS

Unless otherwise noted, the parties do not dispute the following facts:

On March 18, 2015, McManemy borrowed a truck from his friend Janet. Doc. No. 67-3 at 5. McManemy took this truck to go visit his girlfriend and get his motorcycle fixed in Iowa Falls, Iowa. Doc. No. 61 at 8; Doc. No. 67-3 at 4-5. McManemy attached an open air trailer to the truck while in Iowa Falls, and began driving back towards Janet's house in Ackley, Iowa, at approximately 3:30 p.m. *Id.* at 5. At some point on this drive, McManemy's mother informed him over the phone that his father had been admitted to

the hospital in Iowa City for congestive heart failure, and that his father was on his death bed. *Id*. McManemy testified that his plan was to return the truck to Janet, drive to Waterloo and then get a ride from a friend to Iowa City. *Id*.

Meanwhile, officers from Grundy and Butler Counties were engaged in a narcotics investigation involving McManemy. Doc. No. 61 at 120-21. The officers believed McManemy was making a delivery of narcotics and they intended to conduct a traffic stop before he made the delivery. *Id*. Lubben's police report states that "because of prior interaction with [McManemy] it was anticipated that he could try to elude us if he was the driver of the vehicle." *Id*. at 120.

McManemy was first observed by officers about two miles outside of Ackley, Iowa, around 7:20 p.m. Dolleslager's dash camera captures McManemy travelling the opposite direction. Dolleslager Video at 19:26. Dolleslager turned around, activated his lights, and began to pursue McManemy. *Id*. at 19:26-19:28. McManemy testified that he believed Dolleslager saw him run a stop sign. Doc. No. 67-3 at 5. Dolleslager testified that he intended to pull McManemy over for speeding. *Id*. at 26. McManemy agreed that Dolleslager had the right to pull him over and that there was probable cause for an arrest. *Id*. at 7. However, McManemy testified that he did not stop his car because he was scared and because he wanted to return to Iowa City to see his father. *Id*. at 7-8.

The ensuing chase, which reached speeds of 80 to 90 miles per hour, resulted in McManemy's vehicle being rammed twice and involved a detour through a plowed cornfield, followed by McManemy dragging a hundred feet of barbed-wire fencing that sparked and whipped against the road behind him. *See generally*, Dolleslager Video, Lubben Video. At one point, Winterberg attempted to throw a spike strip in McManemy's path. Doc. No. 67-3 at 30. This event does not appear on video. However, Winterberg and McManemy agree that the spike strip went through McManemy's front windshield. *Id*. at 7, 30.

McManemy came to a stop after about 12 minutes. *See* Dolleslager Video from 19:26 to 19:38. Several police vehicles surrounded McManemy's truck and an officer

5

yelled at McManemy to get out of the car. Lubben Video at 8:50. Other police cars parked between McManemy's truck and Lubben's dash cam, such that Lubben's dash cam captured only audio of the arrest. McManemy's testimony is that he stopped, attempted to make a phone call but realized that his phone was dead, set aside a knife, and lit a cigarette before getting out of the car. Doc. No. 67-3 at 9. Dolleslager's dash cam recorded the visual (but limited audio) of McManemy as he got out of the truck and laid spread-eagle on the ground. Dolleslager Video at 19:38. Lubben testified that as he approached, he saw McManemy place something behind him, potentially in his pocket. Doc. No. 67-3 at 33. This event is not visible on the dash cam.

There is some disagreement over what happened next. McManemy states that he spread his arms and legs and waited to be handcuffed. Doc. No. 67-3 at 9. However, due to a prior shoulder injury, McManemy alleges that he was unable to comply with the officers pulling his right arm behind his back and that he asked the officers to cuff him with two pairs of handcuffs. *Id.* McManemy claims that Lubben knew of his shoulder injury and should have known from prior arrests that two sets of handcuffs were required and, indeed, that McManemy was screaming at the deputies to use two sets of handcuffs. *Id.* McManemy states that his left arm was lying on the ground, touching the side of his body. Doc. No. 61 at 22-23. At least one officer was holding McManemy's head down from the right side. Doc. No. 67-3 at 9 ("And the one's got his knee right on the side of my head (indicating)."). As the group continued to struggle, McManemy argues that Tierney aggressively stepped on and kicked McManemy's right leg. Tierney then placed himself on the left side of McManemy's body, near his head, where he began to knee McManemy's head as it was being held down, doing damages to his left eyeball:

> Q. What are you claiming happened that caused your left eye to swell up and close?
>
> A. Him (pointing to Deputy Tierney) putting his knee into my eyeball about 20, 30 times.
>
> Q. 20 or 30 times?

6

> A. That I – I think. I'm being jerked from the back and being jerked from the side. He's kneeing me in the face.
>
> Q. So he's taking his knee and he's kind of ramming it?
>
> A. Yeah, he's on his knees.
>
> Q. Okay. So you claim the deputy that had brown pants was on his knees?
>
> A. Yes.
>
> Q. And that he was lifting up a knee and kind of smacking it on your eye?
>
> A. Right.

*Id.* at 24. Throughout this interaction, McManemy states that he was screaming for the officers to use two sets of handcuffs and that he was being thrashed around. Officers continued wrenching his arm and there were six deputies "hands-on" McManemy when McManemy states he was tased for the first time. Doc. No. 67-3 at 11. Finally, officers handcuffed McManemy using two sets of handcuffs. McManemy asserts that he was tased at least one more time after he was handcuffed.[3] *Id.*

The officers' version of the arrest differs primarily in that they state McManemy did not remain still when they attempted to cuff them. Although Lubben, Tierney and Johnson each testified that they had control over McManemy's right arm, his left arm was tucked beneath his body, resisting handcuffs. Doc. No. 61 at 35, 43, 47. Dolleslager indicated in his report that McManemy was resisting handcuffs with both arms. Doc. No. 75-1 at 35. Further, the officers denied knowledge that McManemy's shoulder was injured at the time of this arrest. From the audio on Lubben's dashboard camera, the

---

[3] McManemy's testimony has been inconsistent on this point. In the complaint, he alleges being tased upwards of five times. *See* Doc. No. 2 at ¶¶ 24, 26-27. By the time he was deposed in January 4, 2018, his testimony was that he was tased three times: twice in the back and once on his thigh. Doc. No. 61 at 21. This testimony is contradicted by the data readout from the device used to tase McManemy, which indicates he was tased only twice. Doc. No. 75-1 at 33.

officers can be heard telling McManemy not to move at the 10:30 and 11:23 time stamps. Winterberg testified that McManemy was flailing his legs trying to kick Dolleslager. Doc. No. 61 at 58. At 8:22:58 p.m., the readout for Dolleslager's taser indicates that Dolleslager tased McManemy for three seconds. Doc. No. 75-1 at 31. Dolleslager's report indicates that he was able to cuff McManemy's right arm after tasing him in "drive mode,"[4] but that another officer was still struggling to cuff the other arm and requested a second application of the taser. *Id.* at 35. Dolleslager tased McManemy's thigh at

---

[4] Tasers can be used in "drive mode" or in "probe mode:"

> When the officer deploys the TASER ECW in probe mode, and the two probes attach to the suspect's clothing or skin, the device will send a pulsating electrical charge. When there is a successful probe deployment, the subject typically is disabled for the duration of the cycle. The high-voltage, low amperage electrical charge is designed to induce motor-nerve mediated involuntary muscle contractions (NMI) by sending impulses that override the signals of the sensory and motor nervous systems that are sent to and from the central nervous system (CNS). Should only one probe strike the suspect and the other probe fail to make contact, or if one probe attaches to clothing but is more than two inches away from the body, or if one or both probes lose contact with the subject for any reason, or if the probes are too close together on the body, the CED will typically not incapacitate the subject unless the officer is able to approach the subject and do a follow-up "drive-stun" on the subject, which will complete the circuit with the wire(s) that attached during the 'probe' mode attempt.
>
> The "drive-stun" mode is generally considered to be a "pain-compliance" technique, thus a lesser quantum of force that using the probes. . . . Officers generally should not expect NMI to result from a drive-stun. . . . In addition, in a dynamic altercation it is very difficult for an officer to apply and maintain the application of a drive-stun to a person who is resisting or who is reacting to the pain-compliance technique. The drive-stun contact points typically touch the body for part of the time, but are out of contact with the body for part of the time during the dynamic struggle to subdue the suspect.

Greg Meyer, *TASER basics: What every judge and jury should know* (Nov. 14, 2011), https://www.policeone.com/less-lethal/articles/4558608-TASER-basics-What-every-judge-and-jury-should-know/ (accessed 9/28/18). Officer Lubben testified that if a suspect is tased in probe mode, officers must follow protocol for removing the probes from the suspect's skin. Doc. No. 61 at 38. If a suspect is tased in drive mode, only a visual inspection is necessary. *Id.*

8:23:13 p.m. for three seconds, again in drive mode. *Id.* at 31, 35. Officers were able to cuff McManemy after the second taser burst. He was not tased again. *Id.*

During this struggle, Tierney is visible on the Dolleslager video walking around and over Tierney to the left side of his head. Tierney does not appear to dispute that he stepped on or near McManemy's leg before walking around to the left side of McManemy's head but asserts that he may have tripped. Doc. No. 61 at 43. Tierney states that he could not have kicked McManemy's head from his position in the ditch, and that although his knee may have been in contact with McManemy's head while he was trying to secure him, he did not knee McManemy in the face 20 to 30 times as alleged. *Id.* The video shows that Tierney was on his knees by McManemy's head for approximately 41 seconds.[5] Lubben confirmed that he did not see Tierney kick or knee McManemy in the head. *Id.* at 38. While officers were searching McManemy, they found a pair of "brass knuckles" in his rear pocket. *Id.* at 39.

The two dash cam videos submitted with the motion for summary judgment do not clearly support either version of the nights' events. McManemy is seen exiting his truck as officers yell at him and lies down on the ground with his legs spread (his arms are not fully visible) for a few seconds before the first officer reaches him. Over the next minute, five or six more officers join the struggle. The road is stirred up with dust from the car chase and the officers' vehicles' lights are flashing, further obscuring the scene. It is impossible to see or hear when or whether McManemy is tased. It is also impossible to determine whether his legs were kicking voluntarily or involuntarily and his arms are not visible at all. Further, while some of the officers' commands are clearly audible (i.e., "stop resisting"), it is impossible to determine what McManemy may have been saying. After the arrest, officers are seen on the Dolleslager video celebrating.

---

[5] Tierney is visible on the Dolleslager Video from 19:39:18 to the end of the struggle at 19:39:55. However, his knees are not visible during the vast majority of that time.

McManemy was booked into the Butler County Jail. A medical exam found that he was scraped and bruised, but McManemy denied a need for immediate medical attention. Later, McManemy was diagnosed with a contusion and nodular episcleritis in his left eye after he reported symptoms of light sensitivity, headache and "floaters." Medical records from July 7, 2015, indicate that this condition was improved, with treatment no longer needed. Doc. No. 67-3 at 72. No other lasting injuries were reported from the arrest. McManemy was ultimately convicted in state court of felony eluding in violation of Iowa Code § 321.279(b) and operating while under the influence (second offense) in violation of Iowa Code § 321J.2(2)(b). *See Iowa v. McManemy*, 2121 OWCR010317 (Butler County, Iowa).

McManemy and the officers from Butler County are familiar with each other. Prior to the March 18, 2015 arrest, McManemy has been arrested at least three times in Butler County. Doc. No. 61 at 115-119. Officer Lubben testified that he was aware that McManemy has access to weapons. *Id.* at 39.

## V. DISCUSSION

Defendants argue they are entitled to summary judgment on the § 1983 claims because the undisputed facts demonstrate that McManemy's constitutional rights were not violated and that they are entitled to qualified immunity. As for the state law claims, defendants argue that Iowa law immunizes them against claims for assault and battery and negligence and, in the alternative, that no reasonable jury could find in favor of McManemy on the undisputed facts. McManemy generally resists.

### A. *Qualified Immunity Standards*

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation omitted). The Eighth Circuit Court of Appeals has stated:

> "What this means in practice is that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Wilson v. Layne*, 526 U.S. 603, 614 (1999). The Supreme Court has generously construed qualified immunity protection to shield "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

*Davis v. Hall*, 375 F.3d 703, 711 (8th Cir. 2004) (internal citations cleaned up). For the "clearly established" prong of the qualified immunity analysis,

> A legal principle must have a sufficiently clear foundation in then-existing precedent. Normally this requires us – outside of an "obvious" constitutional violation – "to identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). While the case need not be "directly on point, existing precedent must place the lawfulness of the particular [act] beyond debate." *Wesby*, 138 S. Ct. at 590.

*Johnson v. City of Minneapolis*, 901 F.3d 963, 972 (8th Cir. 2018) (internal citations cleaned up).

Whether an officer is entitled to qualified immunity is a fact-dependent inquiry. The Supreme Court has explained:

> The first step in assessing the constitutionality of [the officers'] actions is to determine the relevant facts. As this case was decided on summary judgment, there have not yet been factual findings by a judge or jury, and respondent's version of events (unsurprisingly) differs substantially from [the officers'] version. When things are in such a posture, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. In qualified immunity cases, this usually means adopting the plaintiff's version of the facts.

*Scott v. Harris*, 550 U.S. 372, 377 (2007) (internal citations omitted). In *Scott*, the lower court had accepted the plaintiff's version of the events. However, the Supreme Court

clarified that the plaintiff-friendly summary judgment standard does not require courts to ignore contrary evidence: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

McManemy's case is one of the "usual" cases.[6] As discussed above, the parties dispute whether McManemy resisted being cuffed. The dash cam videos in this case, while providing a spectacular view of the car chase, provide very little information about the disputed arrest. Therefore, for the purposes of this motion, I will accept as true the fact that McManemy did not purposefully resist being handcuffed, but rather that his right arm was unable to move as directed and that his left arm was touching the side of his body. Further, I will assume that Tierney did place his knee[7] on McManemy's face while kneeling next to him, with at least as much force as necessary to cause the black eye that was documented during McManemy's first week at the Butler County Jail. However,

---

[6] The Butler County defendants argue that the ambiguity of the video cannot be used to create a "genuine dispute of material fact" upon which summary judgment can be denied. *See* Doc. No. 59 at 19-20. In *Mann v. Yarnell*, 497 F.3d 826, 827 (8th Cir. 2007), the Eighth Circuit held that "a dark and often unintelligible video coupled with [Mann's] entirely speculative and wishful recitation of events that is neither substantiated by anything displayed in the video nor by the memory of any observer or participant present at the altercation" failed to create a genuine issue of fact because it amounted to "mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions." (citations omitted). This case is distinguishable from *Mann*. Here, it is clear from the video that Tierney is on the ground near the left side of McManemy's head. Tierney agrees that his knee may have made contact with McManemy's head, and indeed, McManemy suffered a black eye with lasting symptoms. The fact that the video does not clearly demonstrate how much force was used and Tierney's intent in using that force means that resolving this issue depends on a credibility judgment. Issues of credibility are not appropriately resolved on a motion for summary judgment.

[7] It is at least clear from the video that Tierney did not kick McManemy in the face. Additionally, the Butler County defendants argue that the truck's driver's side airbag was deployed and caused the injury to the left side of McManemy's face. *See* Doc. No. 59 at 23 n.5 (citing Doc. No. 61 at 48). However, as there is no direct evidence other than Johnson's supposition during his deposition that the airbag caused the injury, I must assume for the purposes of this motion that Tierney did so.

given the undisputed documentary evidence of the times at which the taser was deployed – two bursts of three seconds each, 15 seconds apart – and the fact that McManemy agrees that the first taser burst came before he was handcuffed, I do not find that McManemy was tased after he was handcuffed.

## B. *The Excessive Force Claims*

McManemy makes the following allegations that the defendants violated his Fourth Amendment right to be free from excessive force: (1) Dolleslager, by tasing him repeatedly (Count I), (2) Lubben, by failing to intervene to protect McManemy from this tasing (Count II), (3) Tierney, by kneeing him in the face (Count III) and (4) Lubben and Dolleslager, by failing to protect him from this use of force (Count IV). McManemy argues that the force used was unjustified, unreasonable and demonstrated a willful and wanton disregard for his Fourth Amendment rights. Defendants contend that the force used in arresting McManemy was de minimis and objectively reasonable based on the circumstances the deputies faced.

The standard to apply in excessive force cases is well-settled:

> The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation. [*Graham v. Connor*, 490 U.S. 386, 397 (1989)]. We must consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest. *Id.* at 396.

*Malone v. Hinman*, 847 F.3d 949, 952 (8th Cir. 2017) (citation omitted). "This calculus allows for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citation omitted).

13

This reasonableness standard "is viewed from the vantage point of the police officer at the time of arrest or seizure." *Gill v. Maciejewski*, 546 F.3d 557, 562 (8th Cir. 2008) (citation omitted); *see also Billingsley v. City of Omaha*, 277 F.3d 990, 993 (8th Cir. 2002) ("The aforementioned reasonableness of force is judged from the perspective of the officer on the scene, taking into consideration the facts known to him, as opposed to one possessing the illuminating power of hindsight." (citation omitted)). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). "Circumstances relevant to the reasonableness of the officer's conduct include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). The court may also "consider the result of the force," *id.* (citation omitted), "the extent of the suspect's injuries" and "standard police procedures." *Mann*, 497 F.3d at 826 (citation omitted).

The use of force to effect an arrest is not reasonable when a suspect does not "pose an immediate threat to the safety of the officers or others," and is "not in flight or resisting arrest." *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013); *see also Bauer v. Norris*, 713 F.2d 408, 412 (8th Cir. 1983) ("Force can only be used to overcome physical resistance or threatened force."). Although some force may be justified when an arrestee refuses commands or passively resists arrest (i.e., refusing to stand), the force must be proportionate to the situation. *Compare Rokusek v. Jansen*, 899 F.3d 544, 547-48 (8th Cir. 2018) (when suspect was unarmed and fully within officer's control, but refused order to stand up to be handcuffed, officer used "more than 'the force necessary' to handcuff" the suspect when he lifted him off of the ground and slammed his head into the floor) *with Carpenter v. Gage*, 686 F.3d at 649-50 (when plaintiff suspected of

14

assaulting first responders "refused to offer his hands when ordered to do so, and . . . reached for the couch in an effort to lift himself from the floor . . . deputies on the scene reasonably could have interpreted [his] actions as resistance and responded with an amount of force that was reasonable to effect the arrest."). However, the fact that a suspect may have briefly stopped resisting or briefly complied with arrest does not end the analysis. *See Nelson v. Cnty of Wright*, 162 F.3d 986, 991 (8th Cir. 1998) ("Nelson now tries to analyze the brief struggles as if the incident were composed of distinct and separate segments. At the time, however, it was uncertain what would happen next. The situation was tense and 'rapidly evolving.'" (citing *Graham*, 490 U.S. at 397).).

Finally, "an officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment." *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009). "To establish a failure to intervene claim . . . the plaintiff must show that the 'officer observed or had reason to know that excessive force would be or was being used.'" *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015) (citing *Nance*, 586 F.3d at 612). In other words, there must be a clearly-established constitutional violation underlying the failure-to-intervene.

### 1. *Dolleslager's Actions (Counts I & II)*

Accepting McManemy's version of the events as true (except as clearly contradicted by record evidence), but viewing the arrest and the use of force from the vantage point of the arresting officers, the use of the taser was objectively reasonable. From the officers' point of view, it was not unreasonable to confuse McManemy's inability to bring his arms together behind his back – whether due to injury or resistance – with active, intentional resistance. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) ("an arrestee's subjective motive does not bear on how reasonable officers would have interpreted his behavior" (citing *Carpenter*, 686 F.3d at 650)). Particularly here, where the officers were faced with McManemy's apparent resistance

15

following a lengthy car chase, it was not unreasonable to believe that McManemy was still actively resisting arrest. *See Schoettle v. Jefferson Cnty*, 788 F.3d 855, 860-61 (8th Cir. 2015) (officer's use of force was reasonable although plaintiffs' belligerence was caused by a medical condition, and not by intentional resistance).

McManemy's perceived resistance was sufficient to justify Dolleslager in tasing him twice before he was handcuffed. "Law enforcement officers may use physical force to subdue an arrestee when he fails to comply with orders to lie still during handcuffing." *Carpenter*, 686 F.3d at 649 (citing *Mann*, 497 F.3d at 826). In *Carpenter*, the Eighth Circuit held that the defendant officers "reasonably could have interpreted Carpenter's actions as resistance" when the plaintiff "had his arms underneath him, just huddled up under his chest laying on top of them," and the plaintiff ignored orders and physical attempts by the officers to retrieve his hands for cuffing. 686 F.3d at 649-50. Under those circumstances, the use of a taser in "drive mode" for a five second burst was "reasonable to effect the arrest." *Id.* at 649-50. Similarly, in *Ehlers* the Eighth Circuit held that the use of a taser was reasonable when "Ehler's behavior of continuing to lay on his hand and refusing to comply with instructions" could reasonably be interpreted as resistance. 846 F.3d at 1011.

This case is substantially similar to *Ehlers* and *Carpenter*. It would be unreasonable to require officers to determine, in the midst of an arrest, that an (alleged) injury of which they were not aware prevented McManemy from complying. Further, given the officers' consistent testimony that McManemy's left arm was moving below his body and that he has a history of being armed and fighting (along with McManemy's testimony that he put his left arm against the side of his body), it was not unreasonable to believe that McManemy was actively resisting. This interaction occurred after a 12 minute, high speed car chase, during which officers reasonably suspected that McManemy was armed and carrying controlled substances. Under these circumstances, Dolleslager's use of a taser was reasonable.

Because Dolleslager's actions did not violate McManemy's constitutional rights, Lubben likewise did not violate McManemy's constitutional rights by failing to intervene. Defendants are therefore entitled to qualified immunity with regard to Counts I and II, as there was no constitutional violation.

### 2. *Tierney's Actions (Counts III & IV)*

As to the allegation that Tierney kneed McManemy in the face during the course of the arrest, causing a black eye and nodular episcleritis, it is not as clear that Tierney's actions were reasonable. Tierney alleges that the use of force was incidental to his attempt to restrain McManemy as he resisted, and was therefore reasonable. He further contends that he is entitled to qualified immunity for the use of a knee while restraining McManemy because the Eighth Circuit has previously upheld the use of an officer's knee during an arrest when the suspect was perceived to be actively resisting. *See White v. Jackson*, 865 F.3d 1064, 1080 (8th Cir. 2017) ("[W]e conclude that it was not an unreasonable use of force to push [the plaintiff] to the ground and place a knee on his back."). McManemy responds that Tierney's actions were similar to the gratuitous use of force in *Gill*, 546 F.3d 557.

In *Gill*, the Eighth Circuit upheld an award of damages against an officer when "[t]he evidence show[ed that] Gill did not resist and complied with the officers' demands. While Gill was pinned to the ground by multiple officers, Maciejewski approached and smashed his knee into the hapless suspect's head." *Id*. Under those circumstances, the "knee-drop maneuver" constituted excessive force. *Id*. Similarly, in *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009), the Eighth Circuit held that kneeing the plaintiff five to six times in the back after he was "handcuffed , not resisting, and fully subdued" was a "gratuitous" use of force that could not be justified by the need to effect an arrest.

The actions taken by Tierney are not comparable in force to the "knee-drop maneuver" on a fully-restrained suspect in *Gill*. Nor are Tierney's actions comparable to the "gratuitous" use of force held to be unreasonable in *Krout*, wherein the officer

17

appeared to be punishing a prone suspect. Instead, Tierney approached McManemy from the side and kneeled by his head in an attempt to get him under control. From this position, his knee is alleged to have made contact with McManemy's head from the side as he attempted to restrain McManemy pursuant to a lawful arrest. Unlike the plaintiffs in *Gill* and *Krout*, McManemy was not restrained and subdued at the time Tierney's knee made contact. He had not submitted to being handcuffed and, from the officers' perspective, was still actively resisting the handcuffs.

*White* is closer to the scenario presented in this case. In that case, the Eighth Circuit held that an officer did not use excessive force when he pushed the plaintiff to the ground and placed a knee on his back while he was being handcuffed, because "[t]he right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." 865 F.3d at 1080 (citation omitted). Although the knee in *White* was placed on the suspect's back rather than his face, the purpose of the officer using his knee was the same: to restrain the subject for the purpose of arrest. Further, unlike the plaintiff in *White*, who was not resisting handcuffs at the time he was taken to the ground for arrest, the undisputed evidence in this case indicates that a reasonable officer would believe that McManemy was resisting. McManemy agreed that he was thrashing and screaming, and that he did not give his left arm for cuffing because he wanted the officers to use two sets of hand cuffs and because his shoulder was in pain. As discussed above, McManemy's subjective motive in withholding his arm is not relevant, as I must observe his actions from the point of view of a reasonable officer.

In short, I find that the undisputed facts of this case entitle Tierney to qualified immunity. It is doubtful that he violated McManemy's constitutional rights, and there is no existing precedent that places the lawfulness of Tierney's actions beyond debate. Although it is clear that gratuitous acts of violence, such as the knee-drop described in *Gill*, serve no lawful purpose in an arrest, Tierney's actions in kneeling near McManemy's face and making contact with his face – whether intentional or not – were incidental to his attempts to restrain McManemy as he was resisting arrest.

The fact that Tierney is entitled to qualified immunity ends the analysis of the bystander liability claims against Dolleslager and Lubben. Because it was not clearly established that Tierney's actions constituted excessive force, Dolleslager and Lubben were not on fair notice that their alleged failure to intervene may violate McManemy's Fourth Amendment rights. Thus, the defendants are entitled to summary judgment on Counts III and IV.

## C. *Counts VII, VIII and IX (State Law Claims)*

McManemy also asserts the following state law claims: negligent hiring, training and supervision against Johnson and Butler County (Count VII), assault and battery against Lubben, Tierney and Winterberg (Count VIII) and negligence against Lubben, Tierney, Winterberg and Johnson (Count IX). Because I am dismissing all claims brought under federal law, I must consider whether to retain or decline supplemental jurisdiction over the state law claims.

A district court may decline to exercise supplemental jurisdiction when the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 359 (8th Cir. 2011) (quoting *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009)). While the determination of whether to dismiss state-law claims pursuant to § 1367(c)(3) is a matter of discretion for a district court, "[i]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Barstad v. Murray Cnty*, 420 F.3d 880, 888 (8th Cir. 2005) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Among other things, this reflects a policy that federal courts should avoid addressing state law issues when possible. *Gregoire v. Class*, 236 F.3d 413, 419-20 (8th Cir. 2000).

For all of these reasons, I find that it is not appropriate to exercise supplemental jurisdiction over the remaining state law claims. Those claims will be dismissed without prejudice.

## VI. CONCLUSION

For the foregoing reasons:

1. The motions for summary judgment filed by defendants Bruce Tierney, Kiley Winterberg, Curt Lubben, Jason Johnson and Butler County (Doc. No. 57), and by defendants Kirk Dolleslager, Rick Penning and Grundy County (Doc. No. 74), are **granted in part** and **denied in part**, as follows:

   a. The motions are **granted** as to Counts I, II, III and IV, of the complaint, all of which were brought pursuant to 42 U.S.C. § 1983. Those claims are **dismissed with prejudice**. Judgment in favor of the defendants shall enter with regard to Counts I, II, III and IV.

   b. The motions are **denied** as to Counts VII, VIII and IX, as I decline to exercise supplemental jurisdiction over those state law claims.

2. Counts VII, VIII and IX, which are brought pursuant to state law and are the only remaining claims in this action, are hereby **dismissed without prejudice**.

3. Because this order disposes of all remaining claims, the Clerk shall **close this case**.

**IT IS SO ORDERED.**

**DATED** this 23rd day of October, 2018.

_____
Leonard T. Strand, Chief Judge